# ALBERT H. SAMUEL

## vs.

## THE CITYCO REALTY COMPANY.

### Specific Performance—Mistake.

Where defendant's agent, in quoting the price of lots to plaintiff, made a mistake which would have resulted in the sale of lots listed at $3,000 for the sum of $2,200, and made a contract on that basis, *held* that the mistake having been immediately discovered and made known to plaintiff the same day, and before he could possibly be prejudiced, he was not entitled to specific performance.

*Decided March 23rd, 1922.*

Appeal from the Circuit Court No. 2 of Baltimore City (STUMP, J.).

Bill by Albert H. Samuel against the Cityco Realty Company. From a decree for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Myer Rosenbush*, with whom was *Joseph Bernstein* on the brief, for the appellant.

*Walter C. Mylander*, for the appellee.

ADKINS, J., delivered the opinion of the Court.

This is a suit for specific performance of a contract evidenced by the following receipt, filed as an exhibit with the bill of complaint, viz:

"Cityco Realty Company,
            "2 E. Lexington Street,
                  ' "Room 27.
            "Baltimore, Md., August 4th, 1921.
    "Received from Mr. Albert H. Samuel Fifty &
00/100 Dollars, the same being deposit on Lot 6-7-8,
Sec. B, at Menlo Pk. The total price being $2,200;
terms, $250 down, $50 monthly. The above deposit
not to hold the lots after two days, unless so stated
in this receipt and countersigned by John J. Hurst,
President, Cityco Realty Co., and after that date all
moneys are forfeited. This receipt, if given on the
land, hold lots as above, unless previously sold, in
which case the deposit will be refunded. No repre-
sentations or agreements outside of those set forth in
this receipt shall be binding.
                  "(Signed)   Cityco Realty Co.,
                  "Per E. H. Mitchell, Agent."

    A short time before the above transaction, Mrs. Samuel,
the wife of appellant, met by appointment E. H. Mitchell, a
representative of appellee, on the grounds of Menlo Park, and
was shown a number of lots in the development, including
those mentioned in the contract, which she testifies were
offered to her as a whole for $2,200, but that Mitchell told
her how each was valued separately showing the aggregate
valuation to be $2,200. Mitchell denies that values of the
separate lots were given her, and testifies that he could not
have done so, because two of the lots were bracketed together
on his list and priced together and not separately. Mrs.
Samuel offered $2,000, which Mitchell declined, telling her
that they had but one price, the list price, and he had no
authority to vary it; that Mr. Hurst, the president of the
company, was in California, and his instructions were posi-
tive. She then asked Mitchell to communicate with Hurst
by wire, offering to pay the expense, but this Mitchell de-
clined to do, saying that there was but the one price, and it
made Hurst mad to suggest to him a lower price. Nothing

was accomplished on this occasion.   Mitchell testifies that, in giving Mrs. Samuel the price of $2,200, he was misled by the arrangement of these three lots and the prices placed opposite them on the list.   The list which he says he had with him that day was filed as an exhibit in the case and appears about as follows:

"Menlo Park.
"Section 'B.'

| Lot No. | | Price. |
|---|---|---|
| 4 sold | | $ 800 |
| 5 sold | | 800 |
| 6 | | 800 |
| 7 8 | | 2200 |
| 10 | | 650 |
| 11 | | 650 |
| 12 | | 650 |
| 13 | | 650 |
| 14 | | 650 |
| 15 | | 625 |
| 16 | | 625 |
| 17 | | 625 |
| 18 | | 625 |
| 19 | | 625 |
| 20 | | 625 |
| 21 | | 625 |

It will be seen that 6 has its own price opposite the number, but 7 and 8 are bracketed together, and opposite 8 are the figures $2,200.

Mitchell looking hurriedly at this list, thought 6 was bracketed with 7 and 8, and that the figures opposite 8 represented the price for the three lots, whereas it was the price for 7 and 8: and 6, which was a corner lot, had the price of $800 opposite the number.   A glance at the list will show how such a mistake might easily have been made.

On August 4th, Mr. Samuel, the appellant, went to the office of the appellee, inquired for Mr. Mitchell, and said he

and his wife had decided to buy the lots which had been shown her by Mitchell, and asked Mitchell if $2,200 was the price. Mitchell referred to the price book and, according to his testimony, made exactly the same mistake again, and answered, yes, the price was $2,200. Having made the first mistake and gotten in his mind the idea of a lump price for the three lots, it was easier to make it the second time in a hurried reference to the list.

Mr. Samuel paid fifty dollars on account, there was some further talk about the contract, and the receipt was given. After Samuel left appellee's office, Mitchell turned over to Miss Sheselsy, the bookkeeper, the stub of the receipt book, and then went out. Miss Sheselsy testifies: "Well, my duties are to take care of the price list and post all sales, so that another salesman won't sell the same lot again, and make plats and so forth. I took the bulletin board down and just as I went to look at the price I saw what he had done. Mr. Hurst being out of town, I went to Mr. Colburne and told him what had happened. * * * Mr. Mitchell came in about fifteen or twenty minutes later around noontime, and I told him what he did. I said, 'You made a mistake in your prices.' Mr. Mitchell came back and I explained the error to him and he went to the telephone and tried to get him (Samuel) on the telephone. Then he went to the office and tried to see him, and he tried several times to get him at the office, and I tried myself several times to get him at the office." About half past four or five o'clock she got into communication with Mrs. Samuel, and explained to her the error. Mrs. Samuel "said she didn't know how it could be. She said he was on the property and had his typewritten list with him and he had quoted from that list. I said, 'that is true, he might have had that list and the list I have here I can show you.' I said, 'I can show you the same list he had and there is no change in it,' and she said, 'Well, I will see Mr. Samuel in the next morning.' " It is admitted by both Mr. and Mrs. Samuel that she was told of the mistake that

Md.]                    Opinion of the Court.

afternoon, and that she reported it to Mr. Samuel that evening. The following morning Mr. Colburne, the manager, wrote Mr. Samuel as follows:

"August 5, 1921.

"Mr. Albert H. Samuel,
   "Kingsbury-Samuel Electric Co.,
      "530 N. Calvert Street,
         "Baltimore, Md.

"Dear Sir:

"Mr. Mitchell made a mistake in quoting you a price of twenty-two hundred dollars ($2200.00) for lots Nos. 6, 7 and 8, Section 'B,' Menlo Park, the price being three thousand dollars ($3,000.00).

"The price of twenty-two hundred dollars ($2,-200.00) is for lots No. 7 and No. 8 only.

"Mr. Mitchell has been around to see you several times and called on the phone a number of times, but has been unable to get in touch with you with reference to this matter. We are therefore returning your check of fifty dollars ($50.00), and request that you return the receipt to us which was given you yesterday.

"We will be pleased to take the matter up with you on the basis of three thousand dollars ($3,000.00) for the three lots.

"Yours very truly,

"Cityco Realty Co.,
"(Signed)   E. H. Colburn."

It seems this letter was posted with the outgoing mail for the day late in the afternoon of the day it was written.

Earlier in the day (August 5th), Mr. Samuel returned to appellant's office, and tendered $200 in cash to Mr. Colburne, which was refused. Subsequently on August 8th, 1921, appellant's attorney replied to the letter of August 5th as follows:

"August 8, 1921.

"Cityco Realty Co.,
    "8 E. Lexington Street,
        "Baltimore, Md.
"Gentlemen:

"Mr. Albert H. Samuel has referred to me your letter of August 5, enclosing his check of $50.00. Mr. Samuel tells me he cannot conceive of any mistake being made in this connection as both he and his wife negotiated for the purchase of these lots for about 10 days, the price always having been the same for the three lots. That when the price was quoted your Mr. E. H. Mitchell had a typewritten list showing the prices for these and other lots he had for sale, and the price quoted was from this list.

"Under the circumstances, Mr. Samuel having tendered you $200.00 additional in cash on August 5, within the time prescribed in his receipt, which tender was refused by you, is entitled to a contract, in accordance with his receipt. I am ready to pay you the $200.00 additional at any time you tender the contract, and suggest this be done without further delay, as Mr. Samuel desires to have the title examined immediately, and begin without delay the erection of a two-story, three-family apartment house on the lot, at a cost of approximately $15,000.00, and desires to complete his building operation not later than January 1, 1922.

"I am herewith returning to you Mr. Samuel's check for $50.00, which was enclosed in your letter to him of August 5.

                    "Very truly yours,
                        "(Signed)    Myer Rosenbush."


Mr. Hurst returning home about this time, efforts were made to compromise the matter, but without success; and finally appellee suggested that appellant file a bill for specific performance, so that the matter might be settled in the courts. The bill was filed August 22nd, 1921, and the suit defended

on several grounds, but apparently the decree in favor of appellee, dismissing the bill, was the result of the court's conclusion that, by reason of the mistake of appellee, it would be inequitable to decree specific performance. There was no opinion filed. Our surmise is based on expressions of the court during the progress of the trial. At any rate we find it unnecessary to consider any of the other defenses.

That there was a *bona fide* mistake is established by the testimony of four witnesses, three of whom were merely employees and, so far as appears, could have had no interest in committing a fraud. The mistake was discovered and reported to appellant during the absence in California of the only witness, Mr. Hurst, who cou'' have derived any benefit from fraudulently changing the figures on the list.

On the defense of mistake, the case of *Henneke* v. *Cooke,* 135 Md. 417, is conclusive of the case at bar. The facts of that case were as follows: Theodore C. Waters, an employee in the office of the administrators of the estate of Dr. Cooke on June 15th, 1918, signed a written contract "for administration of estate of Theodore Cooke" for the sale to appellant of a house and lot known as 1709 Collington Avenue, for $1,575, subject to an annual ground rent of $48. It was a corner property, fitted up and used as a store and was valued at $1,700, subject to a ground rent of $60. He thought he was selling the house and lot No. 1711 Collington Avenue, which was next door and an inside lot, and much less attractive. He received and deposited a check for the cash payment. The mistake was discovered more than six months later, and a deed for the property was then refused. Whereupon a bill was filed for specific performance.

In disposing of that case, Judge Burke, in delivering the opinion of the Court, said: "The law applicable to mistake as a defense to a suit for specific performance is well settled in this State. The only possible difficulty that can arise is in the application of the law to the facts of the particular case, which must be decided upon its own facts and circum-

stances. In *Diffenderffer* v. *Knoche*, 118 Md. 189, JUDGE
BOYD, after stating that a sound public policy demands that
the contracts of parties should not be disturbed or rescinded
by the courts for trivial or slight reasons, said: 'But it is
equally well established that the right to the specific perform-
ance of a contract is not absolute, and if one is made under
such circumstances as would make its enforcement unjust,
inequitable and harsh, it may be refused, although the de-
fense is not such as would warrant the rescission of the con-
tract at the suit of the defendant.' In *Sommerville* v. *Cop-
page*, 101 Md. 519, CHIEF JUDGE McSHERRY, in speaking
for the Court, said: 'The granting of the equitable remedy
is said to be a matter of discretion, not of an arbitrary,
capricious discretion, but of a sound judicial discretion, con-
trolled by established principles of equity, and exercised upon
a consideration of all the circumstances of each particular
case.' Then, after explaining what was meant by the dis-
cretion of the court in such cases, he said: 'It is also settled
that specific performance will not be decreed of a written con-
tract to buy land, which on account of a mistake does not
accurately express the terms really agreed upon by the par-
ties. *Kraft* v. *Egan*, 78 Md. 36. It is a well established
rule that in suits for the specific performance of agreements,
even when written, the defendant may, by means of parol
evidence, show that through the mistake of both *or either*
of the parties, the wording does not express the real agree-
ment, or that the agreement itself was entered into through a
mistake as to its subject matter, or as to its terms. In short,
a court of equity will not grant its affirmative remedy to
compel the defendant to perform a contract which he did not
intend to make, or which he would not have entered into had
its true effect been understood. 2 *Pom. Eq.* sec. 860.' The
principles stated at the end of that quotation was repeated in
*Thomas* v. *The G. B. S. Brewing Co.*, 102 Md. 423; and
again in *McLaughlin* v. *Leinhardt*, 113 Md. 261, what was
said by JUDGE McSHERRY was quoted with approval. In 35

*Cyc.* 605, it is said: 'Unilateral mistake of a defendant, not caused or contributed to by plaintiff, has frequently been admitted as a defense, when to enforce the contract would be harsh and unreasonable. In many but not all of the cases defendant's mistake is that of his agent. But where the unilateral mistake was not induced or contributed to in any way by the plaintiff, the defense is. confined to cases where to grant specific performance would be highly unreasonable. A mistake which was solely the result of defendant's inexcusable carelessness is not a defense to a suit for specific performance.' "

Continuing, JUDGE BURKE said: "Generally speaking, it may be said that in every case of mistake there is found more or less negligence in the party setting it up. The law has fixed no definite or absolute standard by which the negligence may be measured. The decision must be controlled by the circumstances of the case. It is said in 2 *Pom. Eq. Juris.,* sec. 856, that: 'It is not every negligence that will stay the hand of the Court. The conclusion from the best authorities seems to be that the neglect must amount to the violation of a positive legal duty. The highest possible care is not demanded. Even a clearly established negligence may not of itself be sufficient ground for refusing relief, if it appears that the other party has not been prejudiced.' "

Applying the law as developed from the authorities quoted to the facts of the particular case, JUDGE BURKE concludes: "Would it be inequitable to enforce the contract? The property sold was appraised at $1,700, and is subject to a ground rent of $60. It was sold for $1,575, subject to a ground rent of $48. As compared with 1711 N. Collington Avenue, which Walters thought he was selling, it is a much more desirable and attractive property. We have carefully considered the testimony as to the respective values of the two properties, but, without discussing it, we will merely say that there is a material difference in the value of the two houses, and that to enforce the contract would inflict substantial loss upon the appellees."

It will be observed that the hardship to the defendant in the above case was solely the loss of the difference between the values of the respective properties. That case is parallel in every respect with the case at bar, but was a much stronger case for specific performance, in that the pecuniary loss would have been less, and a substantial time had elapsed before the mistake was made known to the plaintiff.

In the present case, to enforce specific performance would require the defendant to present to the plaintiff an $800 lot without any consideration, and this too, when the mistake was discovered almost immediately, and made known to the plaintiff on the afternoon of the day on which the contract was executed, and before he could possibly have been prejudiced. In fact it is not claimed that he was in any way prejudiced.

To decree specific performance in such a case would clearly be to repudiate the policy declared in *Henneke* v. *Cooke, supra,* and in a long line of cases prior thereto in this State, and in the decisions in practically all other jurisdictions.

Indeed there is not a single conflicting decision from any jurisdiction cited in his brief, or referred to in the oral argument of appellant, where the facts were at all comparable with those of the present case, and where the relief sought was by way of specific performance.

The decree appealed from will be affirmed.

*Decree affirmed, with costs to appellee.*